## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MATTHEW JAMES HORNER #338-810
      Petitioner                      :

    v.                                    :    CIVIL ACTION NO. JKB-12-2582

BOBBY P. SHEARIN, WARDEN, et al.,   :
      Respondents

### MEMORANDUM

Petitioner Matthew James Horner ("Horner") stands convicted of the 2005 attempted murder of his wife, Laraine Horner ("Laraine").  On August 28, 2012, Horner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 1.  The petition, amended through counsel (ECF No. 42), seeks to overturn the conviction and resulting life sentence.[1]  Although delineated differently by Horner and respondents, the undersigned finds the following issues presented for review:  (1) the State failed to disclose, in violation of *Brady*,[2] that a key witness, Richard Shaffer, was a long-standing paid informant of the Baltimore County Police Department; (2 and 3) counsel provided ineffective assistance in failing both to adequately advise Horner regarding a jury waiver and to adequately investigate the alleged crime; (4) the discovery of new evidence concerning a preexisting relationship between Laraine and Shaffer was not properly considered by the state courts; and (5) the waiver of Horner's right to a jury trial was structurally flawed and thus constitutionally deficient.  ECF No. 42 at 6 and 42-1 at 13-28 (*Brady* violation), 28-34 (defective jury waiver), 34-38 (ineffective assistance); 15-16, 35-38 (newly discovered evidence).

---

[1] Horner states that on October 2, 2006, he was sentenced to life with the possibility of parole for attempted first-degree murder and a concurrent 20-year sentence for use of a handgun to commit a crime of violence.  ECF No. 1 at 2.

[2] *See Brady v. Maryland*, 373 U.S. 83 (1963).

In a limited answer, respondents argue the petition should be dismissed unless Horner withdraws certain claims not first presented in the State courts. ECF No. 43. Respondents concede exhaustion of Horner's claim that the State violated *Brady* by failing to disclose Shaffer's status as a paid informant. But respondents contend that Horner has not exhausted his claim as to the constitutional adequacy of his jury trial waiver or his derivative claim of ineffective assistance of trial counsel regarding that waiver; further, they argue that Horner's claim for ineffective assistance of counsel based on trial counsel's failure to adequately investigate the case is subject to the procedural default doctrine because it was not explicitly raised in Horner's application for leave to appeal the denial of postconviction relief. ECF No. 43 at 13-15. Finally, respondents also argue that Horner's newly discovered evidence claim is barred because such evidence cannot be presented for the first time in federal proceedings. ECF No. 43 at 14 n.6.

Horner counters respondents' exhaustion arguments, contending that the claim regarding the constitutionality of his defective jury trial waiver was fully addressed on direct appeal. He further argues that because the appellate court determined the waiver was not deemed defective, his claim of ineffective assistance based on counsel's failure to adequately advise him regarding the waiver could not be presented on collateral review in the State courts. ECF No. 45 at 4-5. He also contends that the application for leave to appeal the denial of postconviction relief encompassed his claims concerning trial counsel's failure to adequately investigate the case, as well as the postconviction court's failure to fully examine and properly consider the newly discovered evidence presented. Horner asks that respondents be ordered to address the merits of each of his claims or, alternatively, he be granted stay and abeyance pending further State court review of any unexhausted claims.

**Background**

In his amended petition, Horner provides the following information.[3]  On the evening of October 11, 2005, an officer from the Baltimore County Police Department met Laraine at a gas station in response to her complaint of an assault by Horner, who allegedly had  "thr[own] her around the room," causing a red mark on her neck, blood on her right arm, and an abrasion on her right leg.  Laraine declined any medical assistance, claiming she would obtain such assistance on her own.  Rather than seek medical assistance, Laraine, as reflected in her own witness statement, went to the Colonial Motel and spent the night.

The next morning, Laraine filed an application for statement of charges, resulting in Horner's arrest.  That same day, Laraine returned to the house where she lived with Horner, his father, and his stepmother.  Two days later, she saw Horner's vehicle and called police to execute the warrant for his arrest.  Horner was then arrested on the evening of October 14.  Laraine remained in Horner's parents' home after his arrest.

The morning of October 15, Horner's parents received a call to bail him out of jail.  Horner's father left home to post Horner's bond.  Horner and his father left the police station shortly before 7:00 a.m.

At 7:08 a.m. on October 15, a 911 call was placed by Horner's stepmother, stating that Laraine had been injured while in the basement of the home.  Although not initially apparent, Laraine had sustained a gunshot wound.  The trajectory of the bullet traveled from Laraine's chin and upwards through her head, exiting her forehead.  Unable to verbally communicate with the paramedic who treated her, Laraine used hand signals and denied to the first responder on the

---

[3] Horner's recital of the facts is not adopted for dispositive purposes at this juncture, but is restated herein as background useful to the determination of the exhaustion issue raised by respondents.  Horner's citations to the record are, therefore, largely omitted at this time.

scene that Horner had shot her.  Only later, while at the hospital, did Laraine implicate her husband as the shooter.

A handgun was found in the basement of the home, the room where Horner and Laraine lived.  No forensic testing on the handgun connected Horner with the crime.  Further, the Baltimore County Police Department's subsequent bleaching of the handgun – despite their own detective's contention that the handgun contained "biohazards" – obliterated any available evidence that could have been obtained from it.

Horner was convicted of attempted first-degree murder, use of a handgun in the commission of a crime of violence, and second-degree assault after a two-day bench trial before the Honorable Mickey J. Norman.  Horner contends his defective waiver of a jury trial constituted a violation of his Sixth Amendment right and constituted ineffective assistance of counsel.  In essence, he claims his trial was structurally flawed.  ECF No. 42-1 at 28-36.

At a hearing the morning of trial, the following colloquy among Administrative Judge John Grason Turnbull II, Horner, and Horner's counsel, Frank Boozer, occurred:

> THE COURT:  Mr. Horner, you have the right to a jury trial.  That is 12 people chosen at random from the community.  You would have the right to participate in the selection of those jurors and any verdict they render must be unanimous. They must find you guilty beyond a reasonable doubt and to a moral certainty. Do you understand what a jury is?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  Do you wish to be tried by a jury or do you wish to waive that right?
>
> THE DEFENDANT:  I wish to give it to my attorney to decide.
>
> MR. BOOZER:  You told me you want to waive that right.
>
> THE COURT:    Court trial?
>
> MR. BOOZER:  Court trial.

THE COURT:  Judge Norman is ready for you.

ECF No. 42-28 at 3.  Horner argues this waiver is at best an incomplete decision and should not constitute a proper, knowing, and informed waiver; further, because a jury trial is a structural and fundamental right that is personal to the defendant, it cannot be waived by another.  Citing Maryland and federal constitutional law, Horner further argues his "waiver" was invalid under the Due Process Clause because the waiver did not determine whether he knew the extent and impact of the right he was about to forego, given the gravity of the potential sentence and the lack of time he had to consider the waiver.

At trial, the state posited that Horner attempted to kill his wife as retribution for his arrest for assaulting her four days prior to the shooting.  According to the state's theory of the case, Horner left the police station after being bailed out by his father, immediately shot Laraine, and fled the scene.  The State's case included testimony by several officers and employees of the Baltimore County Police Department, as well as a purported expert on gunshot residue.  No one who testified was able to provide a forensic or scientific link of Horner to the crime, which made the two remaining witnesses who testified in support of the State's case – Laraine Horner and Richard Shaffer – the only witnesses of any consequence.

Laraine had a prior history of multiple suicide attempts[4] and had recently checked herself out of the psychiatric unit at Johns Hopkins Hospital against medical advice.  Her eventual claim that Horner was her shooter was muddled by her own prior statements.  The emergency medical technician, who was the first to treat Laraine at the scene, testified that Laraine indicated her husband had ***not*** shot her.  During questioning at the hospital by a Baltimore County detective,

---

[4] Laraine provided some testimony concerning her drug abuse and suicide attempts at trial.  ECF No. 42-4, pp. 203, 216-19, 221-23.

when asked if her husband had shot her, Laraine shrugged her shoulders.  Later, Laraine indicated to the detective that her husband had shot her.

To support its prosecution, the State presented testimony from informant Richard Shaffer, who had a lengthy criminal history (including prior convictions for making false statements to the police and assault on an officer).  Although not paid money for his testimony in Horner's prosecution, Shaffer, who had a registered Confidential Information identification number, regularly was paid by and provided assistance to the Baltimore County Police Department through his "handler," Ed Hann, a Baltimore County narcotics detective.

Shaffer was housed at the Baltimore County Detention Center during the period Horner was awaiting trial.  On November 1, 2005, Shaffer was convicted of armed robbery, robbery, and second-degree assault on a patron of the Colonial Motel.  Presiding over Shaffer's trial was the Honorable Mickey J. Norman, who would later preside at Horner's trial.

Following his conviction, Shaffer contacted Hann.  In consideration at sentencing for his armed robbery conviction, Shaffer purported to have "information" on Horner and two other Baltimore County Detention Center detainees, Martin Czosnowski and Chris Dwyer.

At the time he testified against Horner, Shaffer faced an upcoming sentencing hearing before Judge Norman for the Colonial Motel armed robbery.  Horner's trial counsel did not appear to make this connection at trial; nonetheless, he did confront Shaffer on cross-examination about his prior work with the police.  Shaffer acknowledged that he had provided information to detectives "countless" times, but had merely done so out of the kindness of his heart.  Shaffer – who had a prior conviction for making false statements to the police – did not admit to the financial considerations he had received in exchange for his assisting the police, and the prosecution did nothing to correct the obvious misrepresentation.

Shaffer, who had two prior violent felony convictions, including first-degree assault on a police officer, faced a ten-year mandatory minimum sentence. The State's offer to Shaffer, disclosed at the time of Horner's trial, included the State's withdrawal of the enhanced penalty notice of the ten-year mandatory minimum and a recommendation of a twenty-year sentence, all but four years suspended. In reality, at Shaffer's sentencing, the Assistant State's Attorney (also involved in Horner's prosecution) recommended a ten-year sentence, all suspended with time served. Despite his extensive criminal past, Shaffer served only seven months on the conviction.

At Horner's trial, Shaffer claimed that Horner, while both men were housed on the same prison unit, confessed to him that he had both assaulted and attempted to kill his wife. According to Shaffer, the two began to have "detailed conversations" starting shortly after Shaffer's conviction, during the evenings, when detainees were allowed out of their cells and onto the tier. Shaffer testified that after Horner was released from jail for assaulting his wife, he went home, an argument ensued, and after a brief struggle he fired two bullets.

This testimony contradicted previous statements Shaffer had given the detective, as well as the forensic evidence offered by the State. The firearm allegedly used had a magazine with a 13-bullet capacity. Twelve cartridges were recovered from the scene and inventoried by the Baltimore County Police Department and one spent shell was found inside Laraine's purse – a fact that Horner now argues is consistent with her cleaning up the scene after her failed suicide attempt. Shaffer also testified that Horner thought his wife was dead, called 911, and reported a suicide. However, Horner's stepmother placed the only 911 call made; that call was played in open court. Shaffer also claimed that Horner said he immediately went to purchase new clothes after he got rid of the ones he wore when he allegedly shot his wife. Such testimony regarding a purported cover-up by getting rid of his clothes is contradicted by the testimony of Detective

Alex who found khaki shorts and a Ravens cap – precisely what Laraine claimed Horner was wearing at the time of the shooting – at Horner's girlfriend's house.  Lastly, the struggle that Shaffer claimed took place is not contained anywhere in Laraine's testimony or any of her prior statements to the police – in fact, Laraine explicitly testified otherwise.

Judge Norman specifically cited Shaffer's testimony in support of his finding of Horner's guilt, noting that Schaffer testified that "he [Horner] said that he used his father's pistol, a struggle ensued, and he shot her under the chin."  In addition to these facts, Judge Norman also stated the following:

> He says the Defendant told me he wiped off the gun and put it in the case, and that the gun jammed.  Now, I find that particularly significant, that he said that the gun jammed, because there is only a couple of ways he would know that.  He would either know it from reading it somewhere or being told that by somebody.  There is no evidence in this case that he read it anywhere. … And I listened very carefully to determine if Mr. Shaffer could have learned that tidbit of evidence from a charging document perhaps, or if the Defendant himself told him that, or perhaps this other gentleman who testified, Mr. Martin Czosnowski, but there wasn't any evidence of that.  So how would Mr. Shaffer possibly know an unrefuted fact?

ECF No. 42-4 at 392-93.

Following conviction and sentencing, Horner raised two questions on direct appeal to the Court of Special Appeals of Maryland:

1.    Did the trial court commit reversible error when it allowed a jury trial to be waived without a 'knowing and voluntary' election (or indeed any election) on the part of Appellant? and

2.    Did the trial court commit reversible error when it denied Appellant's motion for a new trial on the basis of newly discovered evidence?

ECF No. 43-2 at 2 and ECF Nos. 43-3 to 43-5.  On June 14, 2007, the intermediate appellate court affirmed Horner's judgment of conviction in an unreported opinion.  ECF No. 43-5.  Horner then sought certiorari review in the Maryland Court of Appeals on the following claims:

       1.       Did the Court of Special Appeals err when it failed to grant a new trial despite the abject lack of a 'knowing and voluntary' waiver of a jury trial (or indeed any election) on the part of Petitioner? and

       2.       Did the Court of Special Appeals err when it found no error on the part of the trial court in denying Petitioner's motion for new trial on the basis of newly discovered evidence?

ECF No. 43-6 at 1.  On September 14, 2007, the Court of Appeals of Maryland denied Horner's petition for writ of certiorari.  *See Horner v. State*, 401 Md. 173 (2007).

On September 4, 2008, Horner filed a petition for postconviction relief in the Circuit Court for Baltimore County.  ECF No. 43-1 at 7.  As amended, litigated, and construed, Horner alleged that (1) the prosecutor committed misconduct by withholding material information related to State's witness Richard Shaffer; (2) trial counsel was ineffective for (a) not objecting to the joinder of two cases by the State, (b) not sufficiently investigating the case, and (c) not sufficiently arguing for the admission of evidence; and (3) he was entitled to a new trial based on newly discovered evidence.  ECF No. 43-7 and 43-8.  Following a four-day hearing, the Circuit Court denied relief by Memorandum Opinion dated September 10, 2010.  ECF No. 43-8.

Horner filed an application for leave to appeal the ruling of the postconviction court, claiming the postconviction court (1) misconstrued the legal standard regarding the State's duty to disclose *Brady* information about a paid informant in a way that insulates prosecutors from disclosure responsibility, despite conclusive proof a Baltimore County police detective who participated in this case knew the informant's true status as a regularly used, paid informant on other Baltimore County criminal cases; (2) erred by not holding Baltimore County prosecutors responsible for failing to make any "reasonable inquiry" into whether their testifying jail-house/drug informant sought or received compensation and other considerations during the "countless" times he provided information to Baltimore County in the past; (3) erred by not

holding prosecutors responsible for the "continuing nature" of the State's *Brady* obligation, where prosecutors unquestionably learned the truth about their paid informant during the period of time between trial and sentencing; (4) erred, where the State admits an undisclosed paid informant was "important" to the State's conviction, by concluding that while the witness's testimony was "important," it was not "material" under *Brady*, simply because it "was not the only direct link between the Petitioner and the crimes"; (5) erred by not addressing each ground raised on postconviction as required by Md. Rule 4-407; and (6) erred in rejecting Horner's compelling newly discovered evidence by characterizing it merely as impeachment evidence.[5] ECF No. 43-9.  By unreported opinion filed on July 24, 2012, the intermediate appellate court summarily denied Horner's application for leave to appeal.[6]

As previously noted, the undersigned finds five claims raised in Horner's federal habeas corpus petition, as amended.  As discussed further, however, it is difficult to parse each of these claims into isolated categories, given that most arise as a result of the alleged *Brady* violations. Using this "combination approach," Horner further outlines his challenges, alleging (1) the State failed to disclose favorable and material evidence in violation of *Brady* based on the undisclosed evidence of Shaffer's history as a paid informant, which (a) could have provided an opportunity for impeachment; and (b) would have led to the discovery of evidence connecting Shaffer and the alleged victim (and therefore an alternate source of Shaffer's purported "information"); (2) the State court erred in applying *Brady*, and its decision should not be afforded deference;

---

[5] Respondents contend that distilled to its essence, Horner's application for leave to appeal raised only four claims: (A) the prosecution committed a *Brady* violation by not disclosing Shaffer's status as a paid informant; (B) the postconviction court misapplied the *Brady* materiality prong; (C) the postconviction court failed to address Horner's claim regarding the prosecution's disclosure of a police handgun report; and (D) Horner was entitled to a new trial based on newly discovered evidence under state law.  This Court is not inclined to so narrow its review of Horner's case.

[6] The court's mandate issued on August 24, 2012.  ECF No. 43-10.

(3) the State court's factual determination as to Detective Hann's role in the case as Shaffer's "handler" was unreasonable and is entitled to no deference; (4) Horner's trial was structurally flawed because he did not knowingly waive his right to a jury trial; and (5) trial counsel was ineffective based on (a) the lack of communication, prior to trial, regarding the consequences of a jury trial waiver; (b) a failure to investigate the facts of the case; and (c) the decision to waive a jury trial given the facts such investigation would have revealed, making a jury trial the best strategy for the defense.

### Analysis

It is axiomatic that before a petitioner may seek habeas relief in federal court, he must have exhausted each claim presented to the federal court by first seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(b)-(c). "[A] prisoner does not have 'to ask the state for collateral relief, based on the same evidence and issues already decided by direct review.'" *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (citation omitted). Rather, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845.

As previously noted, respondents contend that Horner has failed to exhaust his claim regarding the constitutionality of his jury trial waiver because it was decided on direct appeal solely on state law grounds. ECF No. 43 at 13. It is true that the case citations and procedural rule cited by Horner on direct appeal refer to Maryland case law as well as Maryland Rule 4-246, which provides a procedure for waiver of the right to jury trial. The appellate brief, however, specifically lists the "United States Constitution Sixth Amend." in the table of citations. Further, the Maryland cases set forth therein are specifically predicated on the Sixth Amendment, which

guarantees an accused the right to trial by an impartial jury,[7] and refer to Supreme Court precedent for the proposition that a trial judge must be satisfied of "an intentional relinquishment or abandonment of a known right or privilege." *See Johnson v. Zerbst,* 304 U.S. 458, 464 (1938); *Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences"), *cited in State v. Martinez*, 309 Md. 124, 133 (1987); *State v. Hall*, 321 Md. 178, 182 (1990).

In *Harrington v. Richter*, 562 U.S. 86 (2011), and *Johnson v. Williams*, 133 S. Ct. 1088 (2013), the Supreme Court addressed whether a constitutional claim can be deemed adjudicated (and thus exhausted) where the constitutional issue is not squarely addressed by the state court. In *Richter*, the Supreme Court held that even where a state court decision is a summary order lacking explanation, "[w]hen a federal claim has been presented to [that] state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 562 U.S. at 99. In *Johnson*, the Court expanded this presumption to situations where a state court addresses some claims but not others. 133 S. Ct. at 1094-96. The Court explained that "it is not the uniform practice of busy state courts to discuss separately every single claim," and outlined "several situations in which state courts frequently take a different course." *Id.* at 1094. These situations include those where "a line of state precedent is viewed as fully incorporating a related federal constitutional right," *id.*; (2) where a state court does "not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim," *id.* at 1095; and (3) where "a state court may simply regard a claim as too insubstantial to

---

[7] Sixth Amendment protection is made applicable to the states by the Fourteenth Amendment. *See Duncan v. Louisiana*, 391 U.S. 145 (1968).

merit discussion," *id.*

Here, the state appellate court likely did adjudicate Horner's Sixth Amendment claim on the merits because Maryland law incorporates that claim.  In so doing, the state appellate court focused primarily on Maryland Rule 4-246, which stated at the time of Horner's alleged waiver, in relevant part:

> Waiver of Jury Trial – Circuit court.
> (a)  Generally.  In the circuit court a defendant having a right to trial by jury shall be tried by a jury unless the right is waived pursuant to section (b) of this Rule.  If the waiver is accepted by the court, the State may not elect a trial by jury.
>
> (b)  Procedure for acceptance of waiver.  A defendant may waive the right to a trial by jury at any time before the commencement of trial.  The court may not accept the waiver until it determines, after an examination of the defendant on the record in open court conducted by the court, the State's Attorney, the attorney for the defendant, or any combination thereof, that the waiver is made knowingly and voluntarily . . .

The only plausible interpretation of the appellate court's analysis, based upon governing Maryland case law, is that its ruling pursuant to the Maryland Rules necessarily incorporated Horner's arguments under the Sixth Amendment.  Consequently, no separate analysis of Horner's Sixth Amendment claim was required.  Although perhaps the better practice may have been to explicitly outline the Sixth Amendment in the court's discussion of the Maryland rule on jury waiver, the undersigned finds that the court's omission of it is not conclusive on the question of exhaustion.  Appellate counsel fully argued the ground – presented here – that Horner did not knowingly waive his Sixth Amendment right to trial by jury.

Respondents' additional argument that Horner did not exhaust his ineffective assistance of counsel claim as it relates to the jury trial waiver also fails.  The appellate court determined that a Sixth Amendment violation regarding the right to trial by jury did not occur; given this determination, any attempt by Horner to reexamine the issue in the context of ineffective

assistance of counsel would not have been available to him by way of collateral review. *See* Md. Code Ann., Crim. Proc. § 7-106(a)(1) (allegation of error is finally litigated when appellate court decides on the merits of the allegation on direct appeal).

Respondents' next argument as to lack of exhaustion is more troubling:  They assert Horner's claim of ineffective assistance based upon his counsel's failure to investigate is not exhausted because it was not raised in the application for leave to appeal the denial of postconviction relief (ECF No. 43 at 13).   Horner wishes to proceed here on a claim of ineffective assistance of trial counsel based on counsel's failure to (1) research or investigate the case by going to the crime scene or viewing the physical evidence; (2) challenge joinder of the two cases (the first alleged assault and the shooting, which occurred several days later); and (3) properly argue for admission of medical records.   The cumulative effect of these alleged errors also is asserted.    ECF No. 1, pp. 4-5.    These allegations were explored at the postconviction hearing and listed by Judge Vicki Ballou-Watts in her 34-page opinion of September 10, 2010.  ECF No. 43-8 at 5; *see also* 43-7, Memorandum Listing Issues Raised, at 10-11.  In his application for leave to appeal the denial of postconviction relief, Horner lists each of these claims, ECF No. 43-9 at 9, but thereafter argues generically that the postconviction court committed error by failing to address each ground raised as required pursuant to Maryland Rule 4-407.  ECF No. 43-9 at 3.

Horner's discussion of the claims not addressed by the postconviction court focused not on trial counsel's failure to investigate the crime scene and obtain other evidence (such as Laraine Horner's medical history of suicide attempts and drug abuse), but rather turned on "the State's shocking disclosure on the morning of the post-conviction hearing that the gun in this

case only held a maximum of 13 bullets and there were 12 loaded bullets found in the weapon,"

*id.* at 23, a discussion intertwined with Horner's *Brady* claim:

> This information destroyed any supposed credibility of the jail-house informant/paid informant, Richard Shaffer.  Shaffer's only value to this case was the supposed reliability of his claim that the defendant gave him a jail-house confession.  However, Shaffer claimed the "confession" was that the defendant fired either 5 bullets, or a series of shots out of the gun before it "jammed."  [Citation omitted].  Petitioner's Post Conviction Exhibit 9 establishes that the police concluded no more than one bullet could have been fired before the gun jammed, and so Shaffer got the story impossibly wrong.

> During the post-conviction hearing, Mr. Horner's counsel handed the court a document specifically listing this new gun evidence as a *Brady* claim.  The evidence was only disclosed to post-conviction counsel by the Baltimore County police on the day before the post-conviction hearing started in March, 2010.  The State did not object to this exhibit, nor did the State object to argument over the new "one bullet" evidence, which was argued at length by post-conviction counsel in court.[9]

> This "one bullet" evidence was never presented at trial or ever disclosed by the State under *Brady*.  It is *Brady* evidence because it unquestionably impeaches the credibility of the jail-house informant's testimony.  Moreover, proof that only one bullet was fired is far more consistent with the defense theory of a suicide attempt, than having to account for 5 shots that never happened.

> Without this information at trial, Shaffer was able to testify to varying scenarios, of multiple bullets being fired without the evidence the police knew to impeach him.  Mr. Horner's trial counsel testified that he would have used anything he could to impeach Shaffer's testimony because he felt Shaffer's testimony was the "nail in the coffin."

> This evidence would have so undermined the supposed credibility of Shaffer's story that it would have alone created a substantial possibility of a different outcome.  As such, the post-conviction court should have at least mentioned the allegation.  The failure to do so is a violation of Md. Rule 4-407, and warrants granting of this Application, and granting a new trial.

[9]   The post-conviction evidence revealed that Shaffer had viewed crime scene photos from this incident while in jail prior to telling the police that Mr. Horner supposedly confessed to him.  The crime scene photos showed holes in the ceiling and headboard, and a jammed gun.  This suggested that Shaffer simply made-up his "5 bullet" story from looking at pictures.

ECF No. 43-9 at 23-24.

To some extent, Horner's ineffective assistance claims and *Brady* claims present a new twist as to "what came first, the chicken or the egg?"  In other words, but for the alleged *Brady* violations, trial counsel might have undertaken further forensic testing, viewed physical evidence, visited the crime scene, interviewed additional witnesses, and acted more forcefully in obtaining and introducing complete medical records concerning Laraine Horner's drug use and mental health.[8]  Accordingly, these claims shall be addressed on the merits primarily in the context of *Brady* and addressed separately as well in the context of ineffective assistance of counsel.

The application for leave to appeal also discussed, as a "stand alone" argument, an allegation that the postconviction court should have considered the evidence connecting Laraine Horner and Shaffer to the Colonial Motel as evidence justifying a new trial, rather than limiting its consideration solely to its value as "impeachment evidence" that even if believed did not establish Horner's innocence.  *Id.* at 25.  It is, therefore, exhausted for the purpose of federal habeas corpus review.

Finally, the issue of improper joinder is merely listed in the application for leave to appeal as an ineffective assistance claim (ECF No. 43-9 at 9), without further elaboration.  If deemed unexhausted, it would be subject to the procedural default doctrine.[9]  Horner, however, noted in his petition for leave to appeal the denial of postconviction relief that the postconviction court failed to explicitly rule on each ground presented, thereby implicitly including this issue in his presentation to the Court of Special Appeals.  As a result, the Court deems the issue exhausted.

---

[8] A decision to present such evidence to a jury might also have been influenced by such investigation.

[9] There is little likelihood that a motion to reopen state postconviction proceedings to fully exhaust a claim otherwise subject to default on this basis would be granted.

Respondents shall address the merits of the petition.  A separate order follows.


DATED this __22nd__ day of June, 2015.


                                        BY THE COURT:


                                        _____/s/_____
                                        James K. Bredar
                                        United States District Judge