# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| MATTHEW JAMES HORNER | * | |
| Petitioner | * | |
| v. | * | CIVIL NO. JKB-12-2582 |
| BOBBY P. SHEARIN *et al.* | * | |
| Respondents | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

### I. Background

This federal habeas corpus case brought pursuant to 28 U.S.C. § 2254 was originally filed August 28, 2012, by Matthew James Horner *pro se* in reference to the judgment of conviction entered against him on October 2, 2006, in Baltimore County Circuit Court after he was found guilty in a May 2006 bench trial. (Pet., ECF No. 1.) Horner received a life sentence with possibility of parole for a count of attempted murder and a concurrent twenty-year sentence for a count of use of a handgun during a crime of violence. (*Id.*; No. 03-K-05-004186, Cir. Ct. Balt. Cty.) He also received a concurrent ten-year sentence for second-degree assault. (No. 03-K-05-004215, Cir. Ct. Balt. Cty.)

Briefly, the State's theory of the case was that Horner shot LaRaine Smith (then, his wife, who used the name LaRaine Horner) in retaliation for her having sought his arrest for allegedly assaulting her. No forensic evidence connected Horner to the gun allegedly used in the shooting, a gun owned by Horner's father and kept by him in the house where Horner, Smith, and Horner's parents lived; and no physical evidence established Horner was in the house at the time of the

shooting. The State's case depended upon Smith's testimony and the testimony of a jailhouse informant, Richard Shaffer, who supposedly wrote down Horner's confession while they were both in custody in the same detention center. Horner's theory of the case was that Smith had shot herself in an attempt at suicide, which was consistent with her earlier, intentional efforts to overdose, and that her accusing Horner as the shooter was further retaliation. Horner provided evidence supporting that theory.

Following the Court's granting of the State's (Respondents are collectively referred to herein as "the State") several requests for extensions of time within which to obtain transcripts, private counsel entered appearances for Petitioner Horner. (Dkt. Ent. Sept. 4, 2012 – June 21, 2013.) After a number of extensions to which both sides consented, counsel for Horner filed an amended petition (ECF No. 42), to which the State filed a limited response contending Horner was presenting unexhausted claims to the Court and requesting dismissal (ECF No. 43). The Court reviewed the record, determined that all claims raised by Horner's amended petition had been exhausted in Maryland state courts, and directed the State to file a response on the merits of the petition's claims. (ECF Nos. 46, 47.) Horner contended (1) the State had violated the dictates of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose one of its two key witnesses was a paid informant, (2) Horner's alleged waiver of his right to trial by jury was constitutionally deficient and he did not knowingly and voluntarily waive that right, and (3) he was afforded ineffective assistance of counsel because counsel failed to advise him adequately of his right to a jury trial and because counsel failed to investigate the scene of the alleged crime. (ECF Nos. 42, 42-1.)

Following the State's response (ECF No. 50), Horner filed a motion alleging his counsel had just become aware of newly discovered evidence of Horner's actual innocence based upon

2

then-recent recantations by the two key prosecution witnesses at trial (ECF No. 51); after a case management conference with a magistrate judge and further filings, the parties filed a joint motion to stay federal habeas proceedings to permit Horner to file a petition in state court to reopen his postconviction proceedings for consideration of the newly discovered evidence (ECF No. 61), which was granted on February 18, 2016 (ECF No. 64). The reopened state court proceedings occupied roughly the next three-and-a-half years, finally terminating on July 12, 2019, when Maryland's Court of Special Appeals denied Horner leave to appeal the trial court's denial of postconviction relief. (ECF No. 130.) The parties then submitted additional briefing in the instant proceeding by way of Horner's amended petition and supporting exhibits, the State's amended answer, and Horner's reply. (ECF Nos. 142, 143, 146.)

The amended petition presents more fulsome evidence and argument since it includes the second round of postconviction proceedings. In this iteration, Horner contends the following: (1) the state court unreasonably applied *Brady v. Maryland*'s principles because *Brady* was violated and Horner was thereby prejudiced when the State suppressed evidence, favorable to Horner, that pertained to the two main prosecution witnesses, Richard Shaffer and LaRaine Smith; (2) the state court unreasonably applied the principles of *Napue v. Illinois*, 360 U.S. 264 (1959), when the State knew or should have known that it was using false evidence relating to Shaffer and Smith, it was reasonably likely the verdict was affected by use of that false evidence, and the state court required Horner to prove the State had actual knowledge of false evidence; (3) the state court unreasonably applied the principles of *Patton v. United States*, 281 U.S. 276 (1930), to Horner's purported waiver of a jury trial (a) when it did not conduct a sufficient waiver inquiry not only to ensure Horner was knowledgeable about the characteristics of a jury trial but also to ascertain he was knowingly and voluntarily waiving that right and (b) when Horner did not expressly and

publicly consent to foregoing a jury trial; (4) the state court unreasonably applied the principles of *Strickland v. Washington*, 466 U.S. 668 (1984), when it found no Sixth Amendment violation despite counsel's (a) failure to advise Horner, properly and adequately, of his right to a jury trial and the disadvantages of waiver, (b) failure to investigate the purported crime scene, (c) failure to obtain exculpatory records and videos from the Baltimore Police Department, and (d) failure to present expert testimony; and (5) the state court reached unreasonable determinations of fact in light of the evidence presented as to (a) the source of information for testimony by Shaffer, the jailhouse informant, (b) Shaffer's motivation for recanting his recantation, and (c) the basis for Smith's recantation of her recantation. (ECF No. 142.) The evidence and law applicable to each of these contentions will be analyzed below, beginning with the issue of jury trial waiver.

The petition is now ripe for disposition, and no hearing is necessary. Rule 8(a), Rules Governing Section 2254 Cases in the United States District Court, 28 U.S.C. foll. § 2254; Local Rule 105.6 (D. Md. 2018). The petition will be granted.

## II. Standard for the Writ of Habeas Corpus

The federal habeas statute, 28 U.S.C. § 2254, as amended, provides a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). *See also Bell v. Cone*, 543 U.S. 447, 455 (2005). This "highly deferential" standard is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011) ("If this standard is difficult to meet, that is because it was meant to be."). Petitioner carries the burden of proof to meet this standard. *Pinholster*, 563 U.S. at 181. Even so, "deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Section 2254 provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See 28 U.S.C. § 2254(d)(1) and (2) (amendments enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA amendments to 28 U.S.C. § 2254 require this Court to limit its analysis to the law as it was "clearly established" by Supreme Court precedent at the time of the state court's decision. *Pinholster*, 563 U.S. at 182.

Thus, under the "unreasonable application" prong, "a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (internal quotation marks and citations omitted). To be "unreasonable," the state court's application of

5

Supreme Court precedent must have been more than incorrect or erroneous. *Id.* "The state court's application must have been 'objectively unreasonable.'" *Id.* (citing *Williams*, 529 U.S. at 409). "[A] federal habeas court may overturn a state court's application of clearly established federal law only if it is so erroneous that there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Nevada v. Jackson*, 569 U.S. 505, 509-09 (2013) (second alteration in original).

The Supreme Court has also articulated the standard for review of state-court factual determinations:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2). . . A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El*, 537 U.S. at 340, 341-48 (casting doubt on state postconviction court's credibility determination as to prosecutorial discrimination in jury selection when strong, objective evidence was at odds with credibility determination).

## III. Analysis

### A. Jury Trial Waiver

#### 1. Legal Standard

In the Constitution's Sixth Amendment, it is provided, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." Though its language expressly applies only to the federal government, the Sixth Amendment's right to trial by jury in criminal cases was recognized as a fundamental principle of due process and, therefore, applicable to the States by way of the Fourteenth Amendment in *Duncan v. Louisiana*, 391 U.S.

145, 149-50 (1968), for "serious" crimes, *id.* at 159-61. It is undisputed that the charges against

Horner are "serious," and that he was entitled to have a jury trial. Of course, as with other rights,

the right to a jury trial for one criminally accused may be waived.

The Supreme Court case that set the standard for a jury trial waiver is *Patton v. United*

*States*, 281 U.S. 276 (1930), *abrogated on other grounds in Williams v. Florida*, 399 U.S. 78

(1970) (finding jury trial right did not necessarily require twelve-person jury). There, the Court

noted,

> Trial by jury is the normal and, with occasional exceptions, the preferable mode of
> disposing of issues of fact in criminal cases above the grade of petty offenses. In
> such cases the value and appropriateness of jury trial have been established by long
> experience, and are not now to be denied. Not only must the right of the accused
> to a trial by a constitutional jury be jealously preserved, but the maintenance of the
> jury as a fact-finding body in criminal cases is of such importance and has such a
> place in our traditions, that, *before any waiver can become effective, the consent of*
> *government counsel and the sanction of the court must be had, in addition to the*
> *express and intelligent consent of the defendant. And the duty of the trial court in*
> *that regard is not to be discharged as a mere matter of rote, but with sound and*
> *advised discretion, with an eye to avoid unreasonable or undue departures from*
> *that mode of trial or from any of the essential elements thereof, and with a caution*
> *increasing in degree as the offenses dealt with increase in gravity.*

281 U.S. 276, 312–13 (emphasis added).

In *Patton*, government and defense counsel stipulated "in open court," with the "defendants

personally assenting thereto," that the trial should proceed with eleven jurors after one of the

twelve jurors became severely ill. *Id.* at 286. The court consented to the stipulation only after

stating the defendants and the government were entitled to a jury of twelve and that absence of one

juror would result in a mistrial unless both government and defendants waived all objections and

agreed to proceed before an eleven-person jury. *Id.* Again, in open court, the stipulation was

renewed by all parties. *Id.* Defense counsel also indicated "[d]uring the colloquy," that he had

"conferred with all counsel and with each of the defendants individually," and all agreed to finish

7

the trial with eleven jurors. *Id.* The Supreme Court determined that the defendants could waive, and did waive, their right to a twelve-person jury under the standard stated above. *Id.* at 312-13. *See also Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 277-78 (1942) (reaffirming defendant's right to dispense with jury trial "where this action is taken with his express, intelligent consent, where the Government also consents, and where such action is approved by the responsible judgment of the trial court"; nevertheless concluding in that case that *pro se* defendant, characterized by Supreme Court as "a shrewd and experienced layman," could constitutionally waive right to jury trial without his having consulted with lawyer). However, "whether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." *McCann*, 317 U.S. at 278.

The traditional standard for waiver of constitutional rights was set forth by the Supreme Court in *Johnson v. Zerbst*, 304 U.S. 458 (1938), in the context of an accused's decision to forego the assistance of counsel: "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.* at 464. Further, the *Johnson* Court noted, "It has been pointed out that 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.'" *Id.* Thus, the *Johnson* standard applies generally to waiver of fundamental constitutional rights, including waiver of the jury trial right, as has been recognized in *McCann*: "The short of the matter is that an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury . . . ." 317 U.S. at 240. As noted previously in *Patton*, "the duty of the trial court in [considering

whether to approve a defendant's jury trial waiver] is not to be discharged as a mere matter of rote, but with sound and advised discretion . . . and with a caution increasing in degree as the offenses dealt with increase in gravity." 281 U.S. at 312-13. Consequently, "the purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993). *See also Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

### 2. State Court Proceedings

On the day of trial, Horner and his counsel appeared before the Baltimore County Circuit Court Administrative Judge, John G. Turnbull II, and the following transpired:

> MS. SCHIFFER: Jennifer Schiffer on behalf of the State with Keith Pion on State of Maryland versus Matthew Horner, K-05-4186. He is being brought out.
>
> MR. BOOZER: Frank Boozer on behalf of Mr. Horner.
>
> (The Defendant is present.)
>
> THE COURT: Mr. Horner, you have the right to a jury trial. That is 12 people chosen at random from the community. You would have the right to participate in the selection of those jurors and any verdict they render must be unanimous. They must find you guilty beyond a reasonable doubt and to a moral certainty.

Do you understand what a jury is?

THE DEFENDANT: Yes, sir.

THE COURT: Do you wish to be tried by a jury or do you wish to waive that right?

THE DEFENDANT: I wish to give it to my attorney to decide.

MR. BOOZER: You told me you want to waive that right.

THE COURT: Court trial?

MR. BOOZER: Court trial.

THE COURT: Judge Norman is ready for you.

(The proceedings were ended.)

(Am. Pet. Ex. 19, Prelim. Procdg. Tr. May 8, 2006, ECF No. 142-19.)

Horner was then brought before Judge Mickey Norman:

THE COURT: Is this Mr. Horner?

THE DEFENDANT: Yes.

THE COURT: Good morning, sir.

Has he ever been advised of his right to a court trial?

THE DEFENDANT: I'm going to agree with my attorneys.

MR. BOOZER: He was qualified.

MR. F. VERNON BOOZER: We can do it again.

THE COURT: If you are satisfied. It was done in front of Judge Turnbull?

MS. SCHIFFER: It was, Your Honor.

THE COURT: Are we ready to proceed?

MS. SCHIFFER: The State is proceeding by way of a court trial. I would request the rule on witnesses.

THE COURT: Okay.

(*Id.* Ex. 11 at p. 6, Trial Tr. May 8, 2006, ECF No. 142-11.)

### 3. *State Appellate Court Affirmance of Jury Trial Waiver*

In an unreported decision, the Maryland Court of Special Appeals concluded Horner knowingly and voluntarily waived his jury trial right based upon his being "personally examined" in open court and that Horner's responses were "'at least enough to satisfy the trial court that [he] knowingly waived his jury trial right.'" *Horner v. State*, No. 2098, Sept. Term, 2006, slip op. at 3-12 (Md. Ct. Spec. App. June 14, 2007) (unreported) (alteration in original); *see* ECF No. 43-5.[1]

### 4. *Federal Habeas Analysis*

It is impossible to square the "mere matter of rote" pretrial proceedings in Horner's case with the Supreme Court's direction to courts to "jealously preserve" a defendant's right to be tried by a jury by engaging in an appropriate inquiry on the record in open court and ascertaining,

---

[1] In its earlier opinion finding the jury trial waiver issue had been exhausted, the Court noted that the question had been presented, on direct appeal to the Maryland Court of Special Appeals, with citations to both the U.S. Constitution's Sixth Amendment as well as state court rules and cases. Further, the state court cases cited by the state appellate court were based upon the Sixth Amendment and the *Johnson v. Zerbst* waiver standard. Thus, the Court concluded the jury trial waiver issue was necessarily judged by the state court under federal constitutional standards and, therefore, exhausted. (June 22, 2015, Mem. Op. at 11-14, ECF No. 46.)

through *informed* judgment, whether an *express* waiver of such a fundamental right was truly knowing and voluntary. Instead, it must be concluded that the state trial court gave no more than lip service to these principles, and the state appellate court's determination otherwise constitutes an unreasonable application of established Supreme Court precedent. This is most evident given Horner's actual statements in open court as to whether he wanted to give up that important right: "I wish to give it to my attorney to decide," and "I'm going to agree with my attorneys." His attorney's bare statement, "You told me you want to waive that right," does not suffice as a sound basis for finding that Horner truly understood all that the waiver decision entailed. When the state trial court approved Horner's purported waiver of his right to a jury trial, the record was devoid of any inquiry by the court into the particular circumstances of Horner's case or his background and experience, information that is important, in the Supreme Court's view, to a court's acceptance of a waiver. *See McCann*, 317 U.S. at 278 ("whether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case"); *Johnson*, 304 U.S. at 464 (determination of whether intelligent waiver of fundamental right has occurred "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused"). Also concerning is the state trial court's overly quick and perfunctory decision to have a court trial without any apparent regard for the potential maximum sentence of life in prison, which could have been, and, in fact, was, imposed. That is at odds with *Patton*'s instruction to courts to approach the inquiry "with a caution increasing in degree as the offenses dealt with increase in gravity." In short, the record does not contain *any* evidence that Horner expressly and intelligently consented to waiver of his fundamental right to a jury trial; the lack of such evidence renders the state courts' determination of waiver objectively unreasonable.

To the extent the State may argue Horner acquiesced in his attorney's waiver of a jury trial, this Court may not "presume acquiescence in the loss of fundamental rights," *see Johnson*, 304 U.S. at 464, and without a clear statement by Horner showing he expressly and intelligently consented, any contention he waived his fundamental right of a jury trial necessarily rests upon a presumption of acquiescence. Moreover, even though an attorney has "full authority to manage the conduct of the trial," the Supreme Court has emphasized, "there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client," *Taylor v. Illinois*, 484 U.S. 400, 417-18 (1988), and one of those basic rights, over which "the accused has the ultimate authority to make certain fundamental decisions regarding the case," is the decision whether or not to waive a jury trial, *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

The Court concludes the record fails to show that Horner expressly and intelligently consented to a jury trial waiver. Consequently, Horner has amply shown the state court unreasonably applied Supreme Court precedent to his case and further concludes he has thereby cleared the high bar for the grant of federal habeas relief.

**B. Brady v. Maryland** *claims*

Horner contends the State committed various *Brady* violations. With respect to Shaffer, Horner argues the State failed to disclose that Shaffer (1) had a history as a paid informant, (2) obtained information underlying his testimony from police reports and conversations with police officers, (3) received lenient treatment in exchange for his trial testimony, (4) provided factually incorrect details about the shooting, and (5) previously and falsely claimed that Horner had confessed to four other alleged murders. (Am. Pet. 2, ECF No. 142.) With respect to Smith, Horner argues the State also violated *Brady* by failing to disclose that she (1) did not independently remember how she sustained the gunshot wound, (2) informed the State, both prosecutor and

13

police detective, that she did not remember how she sustained her gunshot wound, and (3) obtained information underlying her testimony from conversations with the prosecutor and police detective. (*Id.*)

### 1. *Procedural Default*

The State argues Horner has procedurally defaulted and has not exhausted his third, fourth, and fifth contentions, *supra*, in relation to Shaffer. (Ans. 33-36.) Horner responds that he did raise these claims in state court and has exhausted them. (Reply 9, ECF No. 146.) Under Maryland law, the state trial court may "reopen a postconviction proceeding that was previously concluded if the court determines that the action is in the interests of justice." Md. Code Ann., Crim. Proc. § 7-104. "Maryland law plainly establishes a right to raise new claims in a motion to reopen a previous [postconviction] proceeding." *Baker v. Corcoran*, 220 F.3d 276, 291 (4th Cir. 2000). The discretionary declination of review of claims raised in a motion to reopen "does not mean they are unexhausted." *Id.*

As for claim three regarding disclosure of the full extent of lenient treatment Shaffer was to receive in exchange for his testimony, Horner raised this in his motion to reopen post-conviction proceedings. (Mem. Supp. Mot. Reopen 2, 16-21, 28, 35-44, ECF No. 80-2; Suppl. Mem. Supp. Mot. Reopen 1, ECF No 146-2.) It was included in his first claim in that proceeding. The state court denied review on that claim as well as most of the others with the blanket statement, "Because the balance of the allegations of error were fully and finally litigated or waived and the Court does not find that it is in the interest of justice to reopen, as to those issues, the Motion to Reopen Post Conviction Proceedings is DENIED." (Status Rep't Ex. A, Order 2-3, Feb. 6, 2017, ECF No. 89-1.) This Court is left to guess whether the current claim about failure to disclose the full extent of leniency to Shaffer was one of the unspecified "allegations of error" that were "fully and

14

finally litigated" or whether it was one of the unspecified "allegations of error" that were "waived." Without a clear statement from the state court that it was defaulted, the Court presumes claim three was "fully and finally litigated." Though the State contends Horner failed to exhaust it by not raising it in his application for leave to appeal to the Maryland Court of Special Appeals (Ans. 33), he did ask to appeal the denial of the other claims included in the lower court's blanket denial, including the State's leniency to Shaffer (Status Rep't Ex. 1, App'n Leave Appeal 16, 26-28, ECF No. 112-1). The appellate court denied leave to appeal. Consequently, Horner did exhaust this claim, and it is not procedurally defaulted.

As for claim four regarding the State's failure to disclose factually incorrect details provided by Shaffer about the shooting, the Court cannot find that this claim was ever presented to the state courts, other than when Shaffer was cross-examined at trial about the number of gunshots. But since that was the case, it does not seem to fit within the category of *Brady* violations. In any event, it is one of the least persuasive issues raised by Horner.

Last, as for claim five relating to Shaffer's false claim that Horner had committed several other murders and the State's knowledge that information was false, Horner states his counsel was unaware of the extent of Detective Alex's knowledge until the 2018 postconviction hearing when Alex testified about it. (Reply 12.) Afterwards, Horner raised it in his application to the Maryland Court of Special Appeals for leave to appeal the denial of postconviction relief. (App'n Leave Appeal 20.) The claim is exhausted and not procedurally defaulted.

### 2. *Legal Standard*

Irrespective of the good faith or bad faith of the prosecution, suppression by the prosecution of evidence favorable to an accused is constitutional error where the evidence is material either to guilt or punishment. *Brady*, 373 U.S. at 87. Thus, the prosecution's failure to disclose such

15

evidence to the defense is a violation of the constitutional requirement of due process "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); *id.* at 685 (White, J., concurring in part and concurring in judgment)). "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434. Favorable evidence is either exculpatory of the defendant or impeaching of an adverse witness. *Bagley*, 473 U.S. at 676. The prosecutor is charged not only with knowledge of favorable information known to the prosecutor but also with knowledge of favorable information known only to the police and not personally by the prosecutor because "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437.

Any omission must be analyzed in relation to the entire evidentiary record. *United States v. Agurs*, 427 U.S. 97, 112 (1976). A reviewing court must "evaluate the tendency and force of the undisclosed evidence item by item [but evaluate its] cumulative effect for purposes of materiality." *Kyles*, 514 U.S. at 437. Impeachment evidence "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, 565 U.S. 73, 76 (2012) (noting that was not the case where impeachment evidence was of only witness linking the accused to the crime). *See also Strickler v. Greene*, 527 U.S. 263 (1999) (considerable physical and forensic evidence, as well as other eyewitnesses, linked defendant to crime; undisclosed impeachment evidence of one eyewitness not strong enough to be considered material to outcome); *Agurs*, 427 U.S. at 113 ("if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt").

16

### 3. *Richard Shaffer's trial testimony*

At trial, Shaffer testified that, beginning in October 2005, he was awaiting sentencing for armed robbery charges in the Baltimore County Detention Center where Horner was also detained awaiting trial. (Am. Pet. Ex. 11, Trial Tr. 148-49, May 8, 2006, ECF No. 142-11.) Shaffer and Horner were housed on the same unit, about six cells away from each other. (*Id.* 149.) According to Shaffer, he and Horner had detailed, friendly conversations after dinner in the evenings. (*Id.* 149-51.) Shaffer said Horner talked about a shooting that had taken place in his home. (*Id.* 151.) Shaffer testified Horner said he was bailed out of jail for assaulting his wife, went home, argued with her, pulled his father's pistol out, had a brief struggle, then fired two shots. (*Id.* 152.) Shaffer stated Horner said the gun was a nine-millimeter gun and that Horner had shot his wife under her chin. (*Id.* 152-53.) Shaffer also said Horner told him the two rounds went into the ceiling and one went into the headboard of the bed. (*Id.* 153.) Horner, said Shaffer, wiped the handgun off and put it back in the case after it had jammed on him. (*Id.*) Shaffer stated Horner thought Smith was dead and called 911 to say he believed his wife had committed suicide. (*Id.* 154.) Shaffer said Horner said he had a girlfriend named Lisa who had "screen names so she could log on to and retrieve [Smith's] emails and messages and everything else. So basically was more or less spying on her." (*Id.* 155.) "At some point," Shaffer contacted the Baltimore County Police Department and eventually spoke with Detective Alex about Horner's case. (*Id.*)

Shaffer said that, after the shooting, Horner said he left his house and went to purchase new clothes. (*Id.* 157.) After that, according to Shaffer, Horner parked his truck in Baltimore City, and Lisa picked him up and took him to her house, where Horner cleaned up, washed gunpowder residue off of him, changed his clothes, and got rid of the clothes he was wearing. (*Id.*) Shaffer stated Horner said he first started thinking about killing his wife on his way home after he was

bailed out on the assault charge. (*Id.*) Shaffer stated Horner said he had turned himself in "[b]ecause his father had been arrested, and they said they would let him go basically if he turned himself in." (*Id.* 160.) Shaffer said he realized Horner's information could be helpful to him (*i.e.*, Shaffer), so, he wrote down what Horner said on a notepad, pretending to be writing a letter home to Shaffer's family. (*Id.* 158.) Shaffer said he did not know Smith. (*Id.* 161.)

On cross-examination, Shaffer was asked about the State's offer to him to testify, and he said, "I believe it was 20 years, all suspended but four, with a lengthy probation." (*Id.* 165.) Then, he was asked about other assistance he had given the police:

> Q.    Have you cooperated with the police in any other matters which provide criminal information against cases and defendants?
>
> A.    Yes.
>
> Q.    How many times have you done that?
>
> A.    Over the years, countless.
>
> Q.    So you would describe yourself as a professional informant?
>
> A.    No.
>
> Q.    Countless. How many times have you provided information to the State?
>
> A.    Not to the State, to a narcotics detective.
>
> Q.    So a state agency, police agency, how many times have you provided information to a police agency regarding an investigation?
>
> A.    Maybe ten.
>
> Q.    Ten times?
>
> A.    Yes.
>
> Q.    How many times have you received leniency or any other consideration in cases against you?
>
> A.    None.

Q.     This is the first case?

A.     Yes, sir, it is.

Q.     The rest were out of the kindness of your heart?

A.     Yes, sir, it was.

(*Id.* 165-66.)

Also, on cross-examination, Shaffer was questioned about the discrepancy between his testimony that two shots were fired and his handwritten notes that three shots were fired, and he responded,

A.     It says here, three shots. I'm assuming that's what it would be then. Right there. In the ceiling, one under the chin.

Q.     So your testimony is three shots in the ceiling and one under her chin?

A.     It would be two shots is, I believe, what he said was in there. Three shots fired total, I believe. And I believe one was in the headboard, two was [*sic*] in the ceiling.

(*Id.* 167.)

### 4.  *Undisclosed evidence as to Richard Shaffer*

In postconviction evidentiary proceedings on November 2, 2017, Shaffer testified he had worked with Detective Hahn of the Baltimore County Police Department since "at least the late 1990s." (Am. Pet. Ex. 3, PC Tr. 120-21, Nov. 2, 2017, ECF No. 142-3.) The following then occurred on Shaffer's direct examination by Horner's postconviction counsel:

Q.     Okay. And it's fair to say that during the course of that cooperation, Detective Hahn paid you every time you gave him information?

A.     Pretty much.

Q.     How many cases do you think you made for Detective Hahn?

A.     Oh geez, I couldn't tell you. Quite a few.

Q.      Over 50?

A.      Probably close.

Q.      Over 100?

A.      No, probably 50 or less.

Q.      All drug cases?

A.      I believe maybe drug and gun. I'm not a hundred percent sure.

(*Id.* 121.) Shaffer's testimony also included the following exchange:

Q.      All right. So my questions that I'm asking you right now are really about Baltimore County, not just Ed Hahn, but if there's another detective that comes to mind, you can tell me.
        During your 20 years of cooperation with Detective Hahn of Baltimore County for these various cases, did – I understand that Detective Hahn also came to your assistance for some arrests, is that right?

A.      Yes.

Q.      So you would get arrested, and you would call Detective Hahn.

A.      Yes.

Q.      And he would come and maybe talk to the officers and they wouldn't arrest you?

A.      It – it went two different ways.

Q.      Okay. Let's talk about those different ways.
        One way is Detective Hahn would come and they wouldn't press charges, correct?

A.      Yes.

Q.      One would come and Detective Hahn would let them know that you were a cooperating witness, and they would agree just to release you out right without even arrest, right?

A.      Right.

Q.      Another was that Detective Hahn would come, and the State's Attorney would give you some sort of a deal, a stet or a nol pros or something.

A.      Correct.

. . .

Q.      Okay.  But you were working with him for 20 years.

        How much do you think he paid you in that 20 years?

A.      I couldn't say.

Q.      Thousands?

A.      No.

Q.      Hundreds?

A.      Probably hundreds.

Q.      Okay.  Cause each time he'd come to pay you, he'd give you 40, 50 bucks?

A.      Twenty, 40, 50 bucks, right.

(*Id.* 122-24.)

Shaffer testified that in 2005 he was convicted in a jury trial before Judge Mickey
Norman—the same judge who conducted Horner's bench trial in 2006—of a charge of armed
robbery in relation to an ex-girlfriend and left the courtroom believing he could get up to 25 years
in prison.  (*Id.* 124-26.)  He called an individual named Melanie Prichard and asked her to get in
touch with Detective Hahn (*id.* 126), who came to see him and brought with him another detective
(*id.* 126-27), subsequently identified as Detective Alex.  Alex told Shaffer "they" (apparently, a
reference to the Baltimore County Police Department) had an interest in individuals with whom
Shaffer was incarcerated.  (*Id.* 128.)  Shaffer was told he would receive a benefit if he helped the
police, and one of the people for whom Alex asked Shaffer's help was Matthew Horner.  (*Id.* 128-
29.)

The extent of that benefit, as it actually materialized after Horner's trial, was revealed in the following exchange:

Q. So you knew at the time you got on the stand to testify against Mr. Horner that you were going to get a benefit and likely be out of jail as a result, correct?

A. It was a possibility. It wasn't a guarantee. Nothing was guaranteed to me.

Q. Right. They said, I'm not making any promises but –

A. Pretty much.

Q. -- wink, wink, you're – you're going home, right?

A. Well, I don't know about all that, but they said they couldn't make no promises. I had to stay incarcerated until after my testimony, and then they came to me and said we're releasing you.

Q. Cause you got out like, what, two weeks later?

A. I'm assuming. It was pretty soon after.

Q. Okay. And that was on time served.

A. Yes.

Q. About 11 months.

A. Somewhere in that area.

Q. And up until you got on the stand and testified against this man, you – you thought you were going to do about 25 years.

A. Pretty much, yes.

Q. Okay. So as a direct result of your testimony, you went from 25 years to 11 months time served, is that fair?

A. Yes.

(*Id.* 148-49.)

Detective Alex also testified at the postconviction proceedings. (Am. Pet. Ex. 25, PC Tr., Mar. 8, 2018, ECF No. 142-25.) Alex said that Detective Hahn told him he had been working with

Shaffer for over ten years, that Shaffer was a regular informant Hahn had used in many circumstances, and that Shaffer was a paid informant. (*Id.* 63-64.) Hahn told Alex that Shaffer had information regarding Horner's case.[2] (*Id.* 42.) Alex testified he likely brought his police reports with him when he met with Shaffer before Horner's trial, although he said he did not show those to Shaffer; however, some things that Shaffer told Alex were not correct, based on Alex's knowledge of the case, and Alex told "him the things that he didn't have right." (*Id.* 66.) Alex did not tell the prosecutors that other information Shaffer had supposedly received from Horner—including Horner's being responsible for other individuals' deaths—was not accurate. (*Id.* 87-88.) Alex agreed that Shaffer came to him seeking a benefit and that Shaffer's serving as an informant "was not from the goodness of his heart or just to do the right thing." (*Id.* 69.)

Keith Pion, the second-chair prosecutor at Horner's trial, testified as to his understanding of a prosecutor's obligations under *Brady*: ". . . if the prosecutors are not aware of that information [in the possession of the police] then I'm not sure how that information, they would be responsible for then providing that information to opposing counsel." (*Id.* 106.) Jennifer Schiffer, the first-chair prosecutor at Horner's trial, knew that Shaffer "had some sort of a relationship with another detective [besides Hahn]," but did not find out he was a paid informant until after the trial. (*Id.* 129-30.) She never inquired about Shaffer's and Hahn's relationship before using Shaffer as a witness at the trial. (*Id.* 130-31.) Schiffer represented the State at Shaffer's sentencing, also in front of Judge Norman, shortly after Horner's trial. (*Id.* 143.)

---

[2] That was consistent with Alex's trial testimony:
> Richard Shaffer has a history with another detective in our agency. He contacted that other detective and told him he had information in reference to an attempted murder, and specifically named Matthew Horner. And that detective sought me out and provided me that information.

(Trial Tr. 132, ECF No. 142-11.)

At an earlier postconviction hearing in 2010, trial counsel testified that no one from the State ever disclosed to him that Shaffer was a paid informant, that he had a ten-year long relationship with the detective for whom he worked as a paid informant, that Shaffer had a specific handler within the Baltimore County Police Department, that Shaffer sought benefits on several different matters, or that some of the matters on which Shaffer had previously informed had been prosecuted by the Baltimore County State's Attorney's Office. (Am. Pet. Ex. 13, PC Tr. 25-26, Mar. 2, 2010, ECF No. 142-13.)

### 5. Federal Habeas Analysis as to Shaffer

Without a doubt, the undisclosed information as to Shaffer's regular status as an informant for Baltimore County Police Department, which not only paid him for his information but also rewarded him by giving him favorable treatment by not arresting him or charging him and, further, intervened for him to receive stets and nolle prosequis in cases where he was charged, was impeachment evidence that should have been disclosed to Horner's counsel before his trial. The state postconviction court erred when it ruled that the State was not obligated to share this information with Horner because he had "not established that the individual prosecutors, any employee of the State's Attorney's Office or any police officer *participating* in his prosecution knew that Shaffer had been a *paid* drug informant." (State's Resp. Ex. 8, Md. PC Ct. Op. 11, Sept. 10, 2010, ECF No. 43-8.) That is a misstatement of the standard.

The Supreme Court has made clear that "the individual prosecutor has a *duty to learn* of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437 (emphasis added). However, the state court absolved the State of any knowledge of Shaffer's history of being rewarded for confidential information, and it ignored the duty of the prosecutors to learn about that evidence, clearly favorable to Horner.

The state court parsed Hahn's knowledge out of the case because he was not personally investigating it; yet, it was Hahn who introduced Shaffer to Alex because Hahn knew that Shaffer had information about Horner, and Hahn also knew that Alex was investigating Horner's case. Moreover, Alex knew that Hahn had relied upon Shaffer as a regular informant before ever meeting with Shaffer. Given that factual context, both Hahn and Alex were plainly "acting on the [State's] behalf in the case." *See Kyles*, 514 U.S. at 437. Thus, the prosecutors had a duty to learn about Shaffer's history with the police department, and this, they failed to do. Their failure is made even more egregious by the clearly false testimony by Shaffer at trial to the effect that his upcoming armed robbery sentencing was the only case in which he had received any leniency or consideration and that the other times he had provided information he had done so out of the kindness of his heart. The prosecutors remained silent when he so testified. In addition, the prosecutor's closing argument reinforced that false testimony:

> Richard Shaffer is important. He is reliable. He is accurate. And he points to the Defendant. What is important, first of all, Your Honor, is that he came to us. We didn't go to him and ask him to get information on the Defendant. He got information on his own. And without having any kind of deal, any kind of offer, he provided that information in writing to the detective. His information is accurate. . . . And the things that he knew he could not have made up. Not only that, but the things he knew he couldn't have gotten anywhere else but from the Defendant's mouth.

(Am. Pet. Ex. 1, Trial Tr. 200, May 9, 2006, ECF No. 142-1.) Shaffer's reliability and accuracy would have been questionable to a factfinder if the full extent of his informant history had been known at trial, including that he and Alex both knew he was only providing information to get a benefit at his upcoming sentencing, that such a benefit would be consistent with the various benefits he had received on many, earlier occasions by providing confidential information, and that all of the other times he had provided information, he had *not* done so "out of the kindness of [his] heart."

Furthermore, Alex's "correcting" Shaffer's errors in his account of Horner's confessed information is also favorable to the defense. Alex's telling Shaffer "the things he didn't get right" could reasonably be seen by a factfinder as coaching of a witness—a witness who, in the prosecutor's closing argument, was characterized as important. That, too, should have been disclosed to Horner. The Court will defer addressing the question of materiality until it has also looked at the evidence that Horner contends should have been disclosed about Smith.

### 6. *LaRaine Smith's trial testimony*

Smith testified she and Horner were married in October 2003 and, at some point thereafter, they moved into his father's home in Baltimore County, Maryland. (*Id.* 5.) The couple began "to have problems" in their marriage, and, in February 2005, she took an overdose of Xanax and Zoloft. (*Id.* 6.) She agreed with the prosecutor's characterization of that overdose as "a cry for help." (*Id.* 7.) She disputed characterization of her overdose as a suicide attempt. (*Id.* 44.) She also denied she had overdosed before February 2005. (*Id.*) She said that after she and Horner had arguments, he would usually go over to the home of his best friend's wife, Lisa Richards. (*Id.* 23.) Smith said she had a good relationship with Horner's parents, Jack and Charlotte Horner,[3] and frequently brought her concern about her relationship with Horner to their attention; they responded by suggesting she go upstairs to another bedroom and sleep there, but not to call the police because they had experienced prior problems with the police in relation to Horner's brother, who, by the time of trial, was deceased. (*Id.* 29-30.) Smith's mother-in-law advised her to get away because Horner was never going to change. (*Id.* 30.)

On October 11, 2005, Smith arrived home from work and found Horner drinking. (*Id.* 7.) She plugged her computer into a dial-up connection. (*Id.*) Horner wanted her to order take-out

---

[3] Referred to by defense counsel in this instance as Mary Horner. (*See id.* 30, 35, 38.) Apparently, her name is Mary, but she goes by Charlotte. (*Id.* 58.)

food, and she asked him to get her the cell phone so she could call. (*Id.*) Smith said Horner was outraged, told her she "needed to learn to abide by his rules," knocked the computer off her lap, and told her he was going to go out and find a girl who was better and younger than she. (*Id.*) Smith said Horner started hitting her, pushed her down on the bed, and put his hands around her throat. (*Id.*) She said they struggled, and Horner began to strangle her; he let go of her and stormed out of the house. (*Id.* 8-10.) Smith testified that, prior to this incident, she had a skin cancer removed from her right ring finger and that a skin graft was taken from her right arm and put on her finger. (*Id.* 9.) She had stitches on both her right arm and her right ring finger, and they broke open as a result of Horner's attack on her. (*Id.* 9.) Her neck was also red. (*Id.* 10.) She also had some blood on her right leg, in connection with treatments for skin tumors, after the attack. (*Id.*)

Smith went upstairs and told her father-in-law she needed to go to the hospital, but went out to her car and drove to an Exxon gas station close to the house, and from there, she called the police. (*Id.* 11.) She showed her injuries to the responding officer, and someone from the crime lab came to photograph her. (*Id.* 11-12.) She went to a hotel that night instead of going home, as the officer directed. (*Id.* 12.) On October 12, she went to the Commissioner's Office and filed a report against Horner; then, she went to work. (*Id.* 12-13.) Smith went home that night, but Horner was not at home then; she did the same on October 13. (*Id.* 13-14.) On October 14, she went to work and, late in the afternoon, returned home, but saw Horner's truck parked behind the house, so, she drove around the block, called the police, and told them a warrant existed for Horner's arrest. (*Id.* 14-15.) The police arrived and arrested him. (*Id.* 15.) Smith basically did nothing that night because she was still upset about what Horner had said to her. (*Id.* 15-16.) She went upstairs to ask her father-in-law if he had heard from Horner, but he had not. (*Id.* 16.) She went back downstairs to the bedroom that she and Horner shared, took some Tylenol P.M., and probably

called her sister-in-law, but the latter was busy and asked Smith to call her back, although Smith did not; instead, she went to sleep. (*Id.* 16-17.)

She woke up to a dim light being turned on in the bedroom, and Horner came downstairs wearing Levis and a dark shirt. (*Id.* 17.) Standing over her, Horner told her "it was going to be the the last time that [she] sent him to jail." (*Id.* 17.) Then, he grabbed her arm, pushed her over, and shot her, but she did not know at the time she had been shot; she heard the noise and she was bleeding badly. (*Id.* 18.) Smith said Horner changed his clothes and put on a pair of khaki shorts and a Ravens baseball hat, and then he ran, but she could not remember which way he ran. (*Id.* 19.) She did not remember what she did next. (*Id.* 20.) She had undergone multiple surgeries in attempts to repair her injuries from the shooting, including on her mouth and her eye, and more were planned. (*Id.* 20-22.)

Smith testified she did not know Shaffer. (*Id.* 22.)

A photograph of the basement bedroom where the shooting occurred depicted a gun, but Smith did not recognize it; she said she did not keep guns in the bedroom. (*Id.* 24-25.) A gun case, shown in a photograph, was not present in the bedroom when she went to sleep on October 14. (*Id.* 25.) Smith knew her father-in-law kept guns in the house, but she did not use them or know where kept them. (*Id.*) Her father-in-law had lent her a gun for about a week at some time in the past so she could protect herself against Horner's girlfriend, who had threatened her. (*Id.* 26.) She had obtained a protective order against the girlfriend, identified later as Brenda Heil. (*Id.* 35-37.)

Smith did not recall speaking with the paramedics after the shooting and did not recall speaking with Detective Alex before she went into surgery. (*Id.* 27.) She remembered at a later, unspecified point Alex's asking her "who had done this to [her]?" (*Id.*) She answered, her

husband, but she did not say that immediately because she was drugged and a lot of people were asking her a lot of questions. (*Id.* 28.) Smith identified Horner in the courtroom as the person who shot her. (*Id.* 28.) She said the shooting was not a suicide attempt, but she also said she was in therapy for anxiety attacks and depression at the time of the shooting. (*Id.* 28, 39, 42.)

On cross-examination, Smith said Horner did not have either a gun case or a pistol in his hand when he entered the bedroom and that she never saw the gun. (*Id.* 51-52.) She said he grabbed her arm, but there was no struggle. (*Id.* 53.) She said, after she was shot, Horner grabbed something and threw it over her face, but Smith removed the object (perhaps a towel) and saw him run upstairs. (*Id.* 54-55.) She never saw Horner holding a gun or a gun case or placing a gun in the gun case at the foot of the bed. (*Id.* 55.) Smith remembered Horner changed his clothes, but she did not remember if that occurred before or after the shooting. (*Id.* 57.)

### 7. Undisclosed evidence as to LaRaine Smith

Horner relies upon Smith's email to his postconviction counsel and her subsequent affidavit, which she executed in January 2017, embodying the information in the email message, in setting forth two instances in which Smith made statements contrary to her testimony at trial. (Am. Pet. 30, 32.) According to Smith's affidavit, she admitted she told the prosecutor and the lead detective that she had no independent memory of how she sustained the gunshot wound. (*Id.* Ex. 23, Smith Aff. ¶ 12, ECF No. 142-23.) In addition, she admitted the prosecutor and the lead detective provided her with police reports and told her what to say at trial. (*Id.* ¶ 11.)

In relation to the first instance of undisclosed evidence, a supplemental police report authored by Detective Alex recounted his contacts with Smith (then still referred to as LaRaine Horner) at the hospital. (*Id.* Ex. 6, Balt. Cty. Pol. Dep't Supplement, 10/28/05, ECF No. 142-6.) In the report, he stated he went to Bayview Hospital on October 15, 2005, around noon and was

advised by Officer Mertz that Smith was being prepped for surgery but could be interviewed. (*Id.* 1.) Alex's report then stated,

> The attending nurse was asked about her level of sedation. On a scale of one to ten the nurse quantified her level of sedation as a six. I observed that Laraine Horner was conscious and aware of her surroundings she would fall in and out of sleep [*sic*]. She was unable to talk because of her injuries but could understand questions and respond by shaking her head yes or no and by writing. The victim's ability to write was severely hampered by the necessary IV lines in her hands. I introduced myself and began to interview her about this crime. I asked her if she had shot herself. She shook her head no. I then asked if her husband shot her and she shrugged her shoulders. I then asked if she wasn't sure and she shook her head yes.

(*Id.*) As far as the undersigned can tell from the record, this supplemental report was likely made available to defense counsel before trial. At one of the postconviction hearings, both Schiffer and Alex testified they did not recall Smith's telling them she had no independent memory of the shooting, but Alex agreed that Smith's shoulder shrug, as recounted in the supplemental report, amounted to a statement of "I don't know." (PC Tr. 39-41, 54-57, 60, 121, Mar. 8, 2018.)

The other instance of allegedly undisclosed information also relies upon Smith's affidavit in which she declares, "I used the information provided to me by Detective Joseph Alex to form my false testimony against Matthew Horner," and "In preparing me to testify for trial, both Detective Alex and Assistant State's Attorney Jennifer Schiffer met with me, provided me with police reports, and told me what to say at trial." (Smith Aff. ¶¶ 10, 11.) At a postconviction hearing, Schiffer denied she had provided either reports or information to Smith or that she had told Smith to what she should testify at the trial. (PC Tr. 121, Mar. 8, 2018.)

### 8. *Federal Habeas Analysis*

Together, Smith's January 9, 2017, affidavit recanting her trial testimony and her testimony at the postconviction hearing about the affidavit are deeply troubling. The state postconviction court discounted the affidavit in its entirety based upon Smith's testimony that she was under

"pressure" to execute it from Horner's postconviction counsel due to his and an investigator's making two unannounced visits to Smith's home in Utah and postconviction counsel's talking with her about his awareness of some of Smith's personal and family circumstances. (Am. Pet. Ex. 26, Am. Mem. & Order 19, Sept. 9, 2018, ECF No. 142-26.) The state court also relied upon another affidavit, dated May 1, 2017, in which Smith recants her earlier affidavit. (*Id.*) But at the March 7, 2018, hearing, Smith not only denied she drafted the second affidavit but also said she did not know who wrote it, who gave it to her, or how she got it, and she could not recall it (PC Tr. 115-16, 157, 159-60, Mar. 7, 2018, ECF No. 142-21), so its provenance and, therefore, authenticity are unknown. Reliance by the state court upon the second affidavit was improper.

Moreover, evidence presented at the hearing severely undercuts the state court's discrediting of Smith's January 2017 affidavit. Shortly after the second, unannounced visit by Horner's postconviction counsel, Mark Schamel, and the investigator, Deborah Martin, to Smith's home in Utah on January 3, 2017, Smith sent three emails to counsel. The first one, date-stamped January 5, 2017, 4:00 p.m., stated,

> Hi Mark, After a few phone calls and some thinking I have to say I don't think Matthew Horner deserves a new trial. The last lawyer pretty much covered everything. Also I am waiting for the list of drugs that you said were in my system after Matt shot me..
> Also, I called the SLC recorder and my name is the only one on the deed. My mom had to pay Laura to sign it over to her. And as far as Skype goes you may want to look up Laura's account. I talked to her on it before she had the baby and after. Also, she made 2 trips here to SLC once when my mom was alive and once after she had passed away. Anymore information you will have to get it from the lawyer who is handling this case. They told me I should have never talked to you without my lawyer being present.
>
> Sincerely,
>
> LaRaine Smith

(Am. Pet. Ex. 24, Martin Aff. Jan. 12, 2017, Ex. 1, Email Smith to Schamel, Jan. 5, 2017, 4:00 p.m., ECF No. 142-24.)

A second email from Smith to Horner's counsel, date-stamped January 5, 2017, 7:37 p.m., stated,

> After speaking to the people in Baltimore. I am refusing to take a polygraph test. I understand that they are not reliable.
>
> LaRaine Smith

(*Id.* Ex. 2, Email Smith to Schamel, Jan. 5, 2017, 7:37 p.m.)

The following day, Smith sent Horner's counsel an email that referred to a conversation between the two of them; this was date-stamped January 6, 2017, 7:59 p.m., and stated,

> Hi Mark, I am writing this as per our conversation. I spent all last night going over and over what happened the day I was shot. I will start from the beginning. I don't remember taking the drugs that were found in my system. I do remember talking to JoAnn Folk. She didn't want to hear any of what I had to say and told me to call her to [*sic*] following day.
> I don't remember seeing Matt at all, or the gun. I don't remember changing my clothes and cleaning myself. I may have had a cigarette but that I don't remember either. That whole evening was a total blur to me. . I don't remember how I got up the stairs to the main floor where my father-in-law was. Mark if there is anything I am leaving out please let me know. I did alot [*sic*] of soul searching from the bottom of my heart and decided that I had better call you. I don't remember the ambulance or the questions that were asked during my trip to the hospital.
> I do remember waking up in the hospital. I was asked several questions by Detective Alex. I feel alot [*sic*] of those answers were put in my head by him in addition to several other officers. I was highly drugged so I don't remember to [*sic*] much of my stay at the hospital. I do remember asking to see Laura and Mike. They came but for how long they stayed I have no clue. I do believe now that without any clear answers that Matt should be released from prison. When I testified I was told what to say. They had brought me in copies of papers to tell me what to say. This whole thing has been a nightmare in my life for the entire 11 years. But it all came to me in one sleepless night. The pieces just didn't fit. The more I tried to remember I realized that I didn't remember anything. I hope this is the information that you needed Mark. If not please call me or adjust the wording as you feel which is the correct way. Deep soul searching has brought me to this point.

Sincerely,
LaRaine Smith

Also Mark I don't have a working printer at this time, so if you need to send me anything it will have to be done by mail or an express service.
I feel like 1000 lbs has been lifted off my shoulders.

(*Id.*, Ex. 3, Email Smith to Schamel Jan. 6, 2017, 7:59 p.m.)

Smith authenticated each of these emails as her own voluntary product at the March 7, 2018, hearing. (PC Tr. 146, 148, 149-56, Mar. 7, 2018.) Smith also admitted that statements from the January 6 email were quoted in the January 9, 2017, affidavit and that the affidavit memorialized things she had said to Horner's counsel and Martin on January 3. (*Id.* 125, 151, 156.) Smith also agreed that she had previously received the January affidavit from Horner's counsel via email for her to review over the weekend before January 9 and that he had sent it to her at her request. (*Id.* 119-21.) And she confirmed that, earlier, she had told Horner's counsel over the telephone, after he had returned to Washington, D.C., that she would be willing to execute an affidavit. (*Id.* 120.) When asked if she remembered two individuals, identified at the hearing as Mr. Nelson and Ms. Howard, coming to her Utah home and bringing to her the January affidavit to be signed, she replied in the affirmative, and she acknowledged she knew those two individuals would be coming to her house that day at a predetermined time. (*Id.* 119, 122.) Smith also conceded that Horner's counsel was in Washington, D.C., when she signed the affidavit in Utah. (*Id.* 123.) She acknowledged she was given another opportunity to review the affidavit before she signed it. (*Id.* 122.) She admitted she had reviewed the affidavit and signed it. (*Id.* 123, 157.) No one told her she had to sign it. (*Id.* 122.) No threats had been made to her about something happening if she did not sign it. (*Id.* 123.) After her earlier, January 5 communication indicating she did not want Horner's counsel's team to contact her, no one from the team called her or was in contact with her in any way until after she called Horner's counsel on January 6 and sent him

33

her January 6 email. (*Id.* 145-48, 155-57.) Smith admitted she signed the January affidavit under the penalty of perjury and that she understood that is the same as sitting in court giving testimony under oath. (*Id.* 135-36, 140, 150, 157.) Smith testified she was not alleging Horner's counsel and Martin were making up the things in the affidavit, and she did not deny saying what was in the affidavit to Martin. (*Id.* 139.) She admitted she never told Horner's counsel that anything in the affidavit was untrue and that she never told Mr. Nelson, who brought the notary public to her Utah home, that the things stated in the affidavit were not true. (*Id.* 140.) On the stand at the postconviction hearing, she conceded the State brought her police reports to help her with her trial testimony. (*Id.* 154.) She admitted that certain points of her trial testimony were incorrect, admitting that she had several overdoses before February 2005 instead of that being the only time she had overdosed (*id.* 103-04, 107) and that she had not graduated from the University of Utah (*id.* 100).

Despite the critical evidence of Smith's January 6 email, the state postconviction court did not even acknowledge its existence. Nor did that court acknowledge any of Smith's testimony that irrefutably established her authorship of it out of her own volition. Similarly, the court ignored Smith's admissions that the affidavit contained quotations from her purely voluntary January 6 email as well as statements she made to Horner's counsel and Martin and ignored her admissions that she understood she was signing the affidavit under penalty of perjury. Disregarding this strong, objective evidence supporting the truthful nature of Smith's January affidavit, the state court instead focused on her testimony that she just wanted "those people" (Nelson and Howard) out of her house as a primary reason for executing the affidavit. But she also admitted they never told her she had to sign the affidavit and no one ever threatened her that something would happen to her if she did not sign it.

Moreover, the state court stated, "It is apparent that Smith was very concerned about issues Schamel raised regarding her communication with family members and the status of the deed to her home, even though these issues had nothing to do with the post conviction case." (Am. Mem. & Order 18, Sept. 18, 2018.) Yet, when the state prosecutor cross-examined Smith at the postconviction hearing, he asked her, "Did you have concern about what came up about the deed?," Smith answered, "No." (PC Tr. 179, Mar. 7, 2018.) Smith also indicated she believed Horner's counsel had talked to her daughter about the deed and that was the reason he had broached the topic of conversation. (*Id.*) A bit later, the prosecutor asked her, "So then did you then become concerned about whatever they were doing [asking about the deed to her house or Smith's communications with her daughter and grandchild]?" (*Id.* 181.) Smith answered, "No I, I didn't, I didn't have any concern." (*Id.*) The prosecutor, despite having already received a clear answer to his question, was then permitted to ask Smith, over Horner's objection, "But obviously you were concerned enough that you were . . . corresponding with him?," apparently referring to the first January 5 email. (*Id.*) Smith then answered, "Yes." (*Id.*) The state court ignored her two, unequivocal, negative answers in this line of inquiry to find that "concerned enough" amounted to "very concerned." The state court also ignored the context of the first January 5 email in that it was followed by the January 6 email in which Smith readily, voluntarily admitted to a change of heart that included no concern whatsoever about those earlier conversations. Equally disturbing is the state court's apparently wholesale discounting of Smith's admissions that she knew, when she signed the January affidavit, that she was doing so under the penalty of perjury and her clear understanding of the equivalency of executing such an affidavit with testifying under oath in the courtroom.

35

As for the conversations about the deed and Smith's communications with family members, at the hearing, Horner's counsel tried to explain those bore upon the credibility of her testimony at that hearing, in which she claimed the January affidavit was untrue, because those conversations occurred at the same time as the conversations counsel and the investigator had with her on January 3, but the judge dismissed that line of inquiry out of hand and sustained almost every, if not every, objection by the State to counsel's effort to bring that before the court. The state court's opinion also apparently accepted Smith's testimony that Horner's counsel had misrepresented himself as being from the "Baltimore County Forensics Department" at the outset of the first visit to Smith in September 2015, but never found incredible the testimony of Martin, the investigator who was a retired FBI agent, that contradicted any notion of misrepresentation. The state court's reference to the September 2015 and January 2017 visits to Smith's home in Utah as "unannounced" suggests that postconviction counsel's making such visits was somehow wrong, but the court does not explain why. Further, the court states, "After disfigurement, multiple surgeries, and a PTSD diagnosis, at a minimum, they should have insisted on Smith consulting with independent counsel before executing the January 9, 2017 affidavit." (Am. Mem. & Order 19.) However, the court does not indicate that what the court felt about counsel's failure to offer unsolicited advice to Smith to consult with independent counsel before executing the January 9, 2017, affidavit rested upon any legal requirement, and this Court is unaware of such.

Again, the state court's glaring omission in its recitation of the evidence of any consideration of the January 6 email or the circumstances surrounding its creation or the circumstances under which it was the reason for the composition and execution of the January affidavit brings this Court to the conclusion that the state court's credibility determination, to entirely discredit the January affidavit, amounted to "an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Too, the unexplained creation and execution of the May affidavit—recanting the recantation as set forth in the January affidavit—cast the May affidavit in dim light; as a result, it is insufficient to counteract the clear and convincing evidence that the January affidavit is truthful and, thus, credible.

It is evident from reading the transcript that Smith was a hostile witness at the postconviction hearing, contradicted herself many times, and tried mightily to avoid making damaging admissions, but the record contains no evidence that her will was overborne by anything Schamel and Martin said or did such that she was not in full control of her faculties and her free will when she signed the January affidavit or that she was not fully cognizant of its legal effect. Consequently, the affidavit *and the January 6 email* provide strong evidence that Smith received coaching from the State prior to her trial testimony. The State denied doing so, and the undersigned does not wish to impugn the integrity of the State's prosecutorial team, but the Court cannot ignore this evidence that should have been disclosed to Horner before his trial merely because it is distasteful to contemplate.

### 9. *Materiality*

The only eyewitness testifying at trial as well as the jailhouse informant—the key witnesses—could have been impeached significantly by the undisclosed evidence that has been spread upon the state court record and presented to this Court. If a factfinder were to judge them to have doubtful credibility, then it is not clear that the State has sufficient evidence otherwise to support its verdict since no physical or forensic evidence established Horner was the shooter. In considering the cumulative effect of all the undisclosed evidence, the Court concludes that impeachment of Smith and Shaffer by the evidence discussed above gives rise to a reasonable

37

probability that the outcome of the trial would have been different had the undisclosed evidence been disclosed to Horner's counsel. The failure to disclose this evidence undermines confidence in the verdict reached. Consequently, the *Brady* violations are an additional and independent reason for granting the writ.

## C. Napue v. Illinois *claim*

Horner argues that the circumstances underlying the state courts' violation of *Brady* also underlie their violation of *Napue v. Illinois*, 360 U.S. 264 (1959). In *Napue*, the Supreme Court concluded, "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Id.* at 269. Further, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*

Preliminarily, the State contends this claim was procedurally defaulted and is, therefore, unexhausted, but the Court finds this objection unpersuasive. The *Napue* claim was clearly before the state courts in the reopened postconviction proceedings and it was included in Horner's unsuccessful application to the Maryland Court of Special Appeals for leave to appeal the lower court's denial of postconviction relief. The claim is neither defaulted nor unexhausted.

On the merits, Horner contends the *Napue* standard can be satisfied by the State's use of evidence it knew or should have known was perjured. (Am. Pet. Mem. Supp. 35-36.) He is mistaken. The Supreme Court has never construed *Napue* to include information that the State should have known. Although it has discussed both *Napue* and *Brady* in some cases involving violations of due process, and although *Brady* and its progeny incorporate the "should have known" standard, the Court has never conflated the two standards. They are separate inquiries within the context of due process. *Brady* "has its roots in a series of cases dealing with convictions

based on the prosecution's knowing use of perjured testimony." *United States v. Bagley*, 473 U.S. 667, 678-79 n.8 (1985) (citing *Napue, Mooney v. Holohan*, 294 U.S. 103 (1935), and *Pyle v. Kansas*, 317 U.S. 213 (1942)). But, as the Court has also stated, "criminal defendants are entitled to much more than protection against perjury," noting protections provided by *Brady, Agurs, Giglio v. United States*, 405 U.S. 150 (1972), and *Roviaro v. United States*, 353 U.S. 53 (1957). *California v. Trombetta*, 467 U.S. 479, 485 (1984). However, a *Napue* violation is evaluated under the harmless-error standard, *Bagley*, 473 U.S. at 679 n.9, while a *Brady* violation is not; instead, an alleged *Brady* violation only requires reversal if a reasonable probability exists that, had undisclosed evidence been disclosed to the defense, the result of the proceeding would have been different, *id.* at 680-81, 682.

Because Horner's *Napue* argument depends upon the incorrect "should have known" standard, and because Horner has not persuasively argued that the State knowingly used perjured testimony, the Court concludes this claim is without merit.

### D. *Ineffective Assistance of Counsel*

Because the Court has determined that Maryland courts' denied Horner due process under *Patton* and *Brady*, and because a new trial is, consequently, required, the Court does not consider the merits of his ineffective-assistance-of-counsel claim. *See Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) ("Because we conclude that the Louisiana courts' denial of Wearry's *Brady* claim runs up against settled constitutional principles, and because a new trial is required as a result, we need not and do not consider the merits of his ineffective-assistance-of-counsel claim.").

## *IV. Conclusion*

The Court concludes that Horner's constitutional rights under *Brady* and subsequent cases and under *Patton* and subsequent cases were violated and that his is entitled to the issuance of the writ of habeas corpus. A separate order follows.

DATED this ___5___ day of ~~January~~ *Feb.*, 2020.

BY THE COURT:

James K. Bredar
Chief Judge